IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

WAYNE E. CAROLUS,

    Plaintiff,

vs.

ROBERT M. WHITNEY, DUANE
HILDENBRANDT (in his official
capacity only), and BREMER
COUNTY, IOWA,

    Defendants.

No. C13-2051

RULING ON MOTION FOR
SUMMARY JUDGMENT

TABLE OF CONTENTS

I.  INTRODUCTION .................................... 2

II. PROCEDURAL HISTORY ............................. 2

III. RELEVANT FACTS ................................. 2
   A.  The Parties .................................... 2
   B.  Background .................................... 3
      1.  Protective Order of October 19, 2010 ............ 3
      2.  Temporary Restraining Order of June 14, 2011 .... 3
      3.  No Contact Order of October 16, 2011 ............ 4
   C.  Carolus' Arrest on December 18, 2011 ............. 7

IV. DISCUSSION ..................................... 9
   A.  Federal Civil Rights Claim ....................... 10
   B.  State Civil Rights Claim ......................... 16

V.  ORDER ......................................... 17

## I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 15) filed by the Defendants on July 16, 2014, the Resistance (docket number 22) filed by the Plaintiff on August 11, and the Reply (docket number 23) filed by the Defendants on August 21. Pursuant to Local Rule 7.c, the motion will be decided without oral argument.

## II. PROCEDURAL HISTORY

On July 8, 2013, Plaintiff Wayne E. Carolus filed a complaint naming Robert M. Whitney, Duane Hildenbrandt, and Bremer County, Iowa as Defendants. Carolus claimed entitlement to recover for assault and battery, deprivation of state constitutional rights, defamation, abuse of process, federal civil rights violations (§ 1983), and malicious prosecution. Defendants filed an answer on September 9, 2013, denying the material allegations and asserting certain affirmative defenses.

On December 2, 2013, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. Also at that time, the case was referred to me for the conduct of all further proceedings and the entry of judgment, in accordance with 28 U.S.C. § 636(c) and the consent of the parties.

After conferring with counsel, this matter was set for a jury trial beginning on March 30, 2015. On July 16, 2014, Defendants timely filed the instant motion for summary judgment.

## III. RELEVANT FACTS

### A. The Parties

Plaintiff Wayne E. Carolus is a resident of Bremer County, Iowa. Defendant Robert M. Whitney is employed as a Bremer County deputy sheriff. Defendant Duane Hildenbrandt was sheriff of Bremer County when these events occurred, and is sued in his official capacity only.

## B. Background

The events giving rise to this action occurred on December 18, 2011. To understand the events of that date, however, it is necessary to first review the acrimonious relationship between Carolus and Pamela A. Carolus.[1] Until recently, Carolus was married to Pamela. They have three children: John (now age 13), Elizabeth (age 11), and Mary (age 9).

### 1. Protective Order of October 19, 2010

The Iowa Domestic Abuse Act (Iowa Code Ch. 236) authorizes a person to file a verified petition in the district court seeking relief from domestic abuse. The court may enter a protective order, including provisions relating to temporary custody and/or visitation of children, and possession of a residence. While the record is somewhat imprecise, there was apparently an action brought by Pamela in 2010 pursuant to Iowa Code Ch. 236. No documents filed in that case are a part of this record, but an order filed in a subsequent divorce proceeding referred to "a companion Chapter 236 case that existed between the parties." *See* Defendants' App. 55. According to the order, "[t]he children have been in [Pamela's] custody since entry of a domestic abuse protective order in Bremer County No. DACV 0004205 (the 'DA action')."

### 2. Temporary Restraining Order of June 14, 2011

At some point, Carolus filed for divorce in Bremer County No. CDDM 001675. On June 14, 2011, Judge Bryan H. McKinley adopted an "Order for Temporary Custody and Visitation and Temporary Restraining Order" submitted by the parties. *See* Defendants' App. 55-58. The children were placed in Pamela's temporary primary physical care, with Carolus to receive visitation on Wednesday afternoons and every other weekend. The order provided that "the parties will exchange the children at the children's school or at the Waverly Police Station if school is not in session."

---

[1] To avoid confusion, I will refer to Pamela A. Carolus as "Pamela."

3

Judge McKinley also ordered that "the parties are mutually enjoined and restrained from being or coming into each other's presence or communicating, whether directly or indirectly, with each other except as specifically permitted by the following exceptions to the general prohibitions of this restraining order." The order then permitted the parties to attend the children's activities, attend joint parenting counseling, and communicate by email regarding the children's activities, as detailed in the order.

### 3. No Contact Order of October 16, 2011

On October 15, 2011, there was an altercation between Carolus and Pamela. Officer Tony Krull of the Waverly Police Department responded to the scene and interviewed Carolus. According to Carolus, John had been with him that day, and Pamela was going to drop Mary off so that she could take Elizabeth out for her birthday.[2] Pamela was upset, however, and kept yelling at Carolus and wouldn't let him leave. Eventually, Pamela grabbed Carolus' left ear and her fingernail cut the back part of his ear, causing it to bleed. Pamela went to the Law Center and was questioned by officers. Pamela admitted that the parties argued and that she grabbed at Carolus when he wanted to leave. According to Pamela, Carolus then grabbed her throat and slammed her up against the side of a vehicle. Carolus admitted that he pushed her "in the chin and neck area" and she "fell back" toward the vehicle. After hearing both versions of the events, officers arrested Pamela for domestic abuse assault and released the girls to Carolus' care.

As part of the criminal proceeding, Judicial Magistrate Steven M. Egli issued a no contact order on October 16, 2011. *See* Defendants' App. 50-51. Carolus is named as the protected party, with Pamela named as defendant. Among other things, the order provides that Pamela "is restrained from any contact" with Carolus. The order further provides that

---

[2] The Court notes that the planned exchange violated Judge McKinley's Temporary Restraining Order filed four months earlier.

4

"defendant [Pamela] may enter the residence once in the company of a peace officer to retrieve defendant's clothing and work-related items."

On November 1, 2011, Carolus filed a *pro se* request to clarify the "order of protection." *See* Defendants' App. 52. Specifically, Carolus asked that he be granted possession "of my farm and home," that the children be added as protected parties, and that the parties be permitted to contact each other in the presence of counsel "to speed up our divorce." Pamela, acting through counsel, filed a resistance on November 4. The matter came on for hearing before District Associate Judge Peter B. Newell on November 21. A transcript of the hearing is included in Defendants' Appendix as Exhibit B (Defendants' App. 29-40).[3] Carolus, who was unrepresented by counsel at the hearing, told Judge Newell that he "would like to be able to go out to the farm" and believed that he "should be the one to have possession of the residence." Pamela's attorney responded by asserting that Judge McKinley's order "controls the custody and visitation issues." Pamela's attorney also noted that "[t]he children reside at the farm with Mrs. Carolus and have done so — in the house — the entire time the divorce has been pending." According to counsel, the initial Chapter 236 action awarded Pamela possession of the farm and "it was just assumed . . . that would continue" when the temporary custody order was entered by Judge McKinley.

After hearing the parties, Judge Newell stated that he was "not going to get involved" in issues that were going to be litigated in the divorce, such as "who's in possession of the house or who has custody of the children." Accordingly, Judge Newell announced that no modification of the no contact order would be entered. Carolus then asked for clarification regarding whether "this order prohibits me from being on my farm." Judge Newell responded: "This order doesn't do that." Carolus told Judge

---

[3] For good measure, Carolus also included a copy of the transcript in his appendix as Exhibit B. (Plaintiff's App. 27-37).

5

Newell that he had been advised by Deputy Whitney that the order prohibited him from being on the farm. When Carolus asked that the assistant county attorney instruct the sheriff's department that he was allowed to be on the farm, Judge Newell responded "I don't know that that's true."

At that point, the assistant county attorney advised Judge Newell that when she talked to Carolus, he didn't seem to understand that the no contact order also prevented him from having contact with Pamela, and she explained that to him. Carolus apparently expressed concerns about wanting to be able to go on his farm and, according to the assistant county attorney, "I said if he had to conduct farming activities, I didn't see any reason he couldn't go onto his farm as long as he didn't have contact with Mrs. Carolus or go into the house where she was residing." Pamela's attorney then advised Judge Newell that neither the chapter 236 order nor the temporary order entered in the divorce action "really addressed the farm, per se." Pamela's attorney stated, however, that "I think as long as they didn't have direct personal contact, he could go in the fields; he just can't go in the house." Judge Newell concluded the discussion by again advising Carolus that "you can't have contact with her and she can't have contact with you."[4]

In an order filed on November 29, Judge Newell declined to modify the no contact order, citing the temporary custody and visitation and temporary restraining order entered by Judge McKinley in the divorce proceeding.

> The Court does not believe that it would be appropriate to modify the no-contact order. The Defendant is prohibited from having any personal contact with Mr. Carolus. Pamela Carolus is prohibited from having contact with Wayne Carolus in person, by telephone, in writing or through electronic communication.

---

[4] On November 28, 2011, Pamela was charged by a trial information with domestic abuse assault causing bodily injury, arising from the events of October 15, 2011. *See* Defendants' App. 41-49. The disposition of that charge is not reflected in the record.

> IT IS FURTHER ORDERED That Wayne Carolus is prohibited from having contact with Pamela Carolus. Wayne Carolus is prohibited from having contact with Pamela Carolus in person, by telephone, in writing or through any electronic communication.

Order of Judge Peter B. Newell filed on November 29, 2011 (Defendants' App. 59).[5]

### C. Carolus' Arrest on December 18, 2011

On December 18, 2011 — approximately one month after the hearing with Judge Newell — Carolus and his brother, Darin, went to the farm "to perform farm labor and remove an item of farming/utility equipment." When Pamela found Carolus on the property, she called 911 and reported a violation of the no contact order. Deputy Whitney and Detective Dave MacDonald were dispatched to the scene. Carolus left the farm and was intercepted by Deputy Whitney nearby. According to Whitney's incident report, he and Carolus went back and forth regarding whether Carolus was permitted to be on the property. Whitney told Carolus that he could not be on the property, and Carolus said "that is not true." Whitney referred to the no contact order and, according to Whitney's report, Carolus told him that "the no contact order says that he can perform normal farming duties and that he had a flat tire on his tractor and he went to get a repair kit for

---

[5] The Court notes that the no contact order was eventually modified by Judge Newell following a second hearing on May 18, 2012 — some five months after the events which give rise to this lawsuit. To avoid confusion between the restraining order entered in the divorce action and the no contact order entered in the criminal case, Judge Newell modified the no contact order to incorporate the language employed by Judge McKinley in the restraining order of June 15, 2011. *See* Order (Defendants' App. 84-87). At the second hearing before Judge Newell, the State opined that Carolus "is not in fear of contact from [Pamela] and [Carolus] is attempting to manipulate proceedings by use of this no-contact order." Defendants' App. 85. The assistant county attorney also advised Judge Newell that "law enforcement has been threatened with lawsuits" by Carolus' attorney over their enforcement of the no contact order. *Id.* I note, however, that neither Judge McKinley's restraining order, nor Judge Newell's modified no contact order, specifically addresses Carolus' right to enter on the farm property.

7

it."[6] Whitney again told Carolus that he could not be on the property, and Carolus again said "that was not true." Carolus told Whitney that "a judge told him that he could go out there for farming duties." Whitney asked if "it was written on the order that he could go out to the property" and Carolus responded "it was pretty clear." Whitney again asked whether it was written.

Deputy Whitney then examined some "paperwork" given to him by Carolus, but it did not say anything about Carolus being able to go out to the property. Detective MacDonald also reviewed the paperwork and did not see anything that allowed Carolus to go out there to do farming duties. MacDonald then went to the farm to speak with Pamela. In his report, MacDonald described the interview:

> She described seeing Wayne's brother Darin at the farm and he had asked to retrieve a saw and some other items. She granted permission to do this. She then walked out to the building where Darin was loading these items. While talking to Darin she heard someone moving inside the building. At one point Wayne then walked out of the outbuilding. She then left and called 911.

Supplemental Report of Detective MacDonald (Defendants' App. 82).

Carolus described the events of December 18 in a divorce hearing on July 11, 2012. A transcript of portions of the hearing was introduced as Plaintiff's Exhibit A (Plaintiff's App. 3-26). Carolus testified that he and his brother, Darin, went to the farm "to get the tire repair kit out of the shed and to count hay bales and see what kind of a trailer I should bring back." Darin asked to use the radial arm saw, which was in the garage. Darin apparently went to the house to ask Pam's permission to take the saw and, according to Carolus, "Pam was cordial in allowing Darin to get the saw out of the garage." At some point, however, "Pam came out of the house, I'm not exactly sure why, after she had

---

[6] In his Complaint, Carolus states that his "purpose in being at the Carolus homestead on December 18, 2011 was to load hay." *See* Complaint (docket number 2) at 7, ¶ 29.

8

given my brother the saw, and then we finished what we were doing and left, and then a few miles down the road we were pulled over." *See* Plaintiff's App. 10.

While driving back to Deputy Whitney's location, Detective MacDonald attempted to contact the assistant county attorney, but got her voicemail and left a message. MacDonald then called Judge Newell. According to MacDonald's report, Judge Newell remembered the hearing on Carolus' request to modify the no contact order to allow him on the property for farming purposes. According to MacDonald's report, "Newell stated he had denied this request and had not given any verbal permission." When MacDonald returned to the scene, he told Whitney that "Judge Newell told him that he did not make changes to the no contact order." Carolus was then placed under arrest and transported to the Bremer County Jail.

According to Deputy Whitney's Report of Contempt of Court (Defendants' App. 75), Carolus was taken into custody at 2:27 p.m. on December 18. He was apparently seen by a judicial magistrate and released on his own recognizance the same day. *See* Defendants' App. 79-81. The contempt of court action was dismissed on February 10, 2012, with Carolus ordered to pay court costs in the amount of $100. *See* Defendants' App. 83.

## IV. DISCUSSION

Carolus' complaint is in seven "divisions." Division I sets forth "facts common to all claims." Divisions II-VII assert claims for assault and battery, deprivation of state constitutional rights, defamation, abuse of process, federal civil rights (42 U.S.C. § 1983), and malicious prosecution. However, in his resistance to Defendants' motion for summary judgment, Carolus states that he "is abandoning his claims for malicious prosecution and assault and battery."[7] Furthermore, in his resistence to the motion for summary judgment, Carolus does not address his claims for defamation and abuse of process. In the

---

[7] Carolus' Resistance (docket number 22) at 2.

9

"Conclusion" to his resistance, Carolus asks that summary judgment be denied on Divisions III (deprivation of state constitutional rights) and VI (federal civil rights).[8] The Conclusion also states that "Plaintiff's other claims, against all Defendants are withdrawn and will be subject to a motion for voluntary dismissal."[9] Accordingly, it is the Court's understanding that Carolus is also abandoning his claims for defamation and abuse of process.

The focus of Carolus' resistance is on his claim that Whitney violated his rights under the state and federal constitutions by arresting him without probable cause on December 18, 2011. While Carolus' federal civil rights claim (Division VI) is directed to all Defendants, Carolus states in his resistance to the motion for summary judgment that "Plaintiff is making no independent claim under 42 U.S.C. § 1983 against Defendants Bremer County and Hildenbrandt."[10]

### A. Federal Civil Rights Claim

The Court will first address Carolus' claim that his warrantless arrest violated his rights "under the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States."[11] In his brief, Carolus points to the Fourth Amendment guarantee against "unreasonable seizures," as applied to the states under the Fourteenth Amendment. "The essential elements of a constitutional claim under § 1983 are (1) that the defendant acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *L.L. Nelson Enterprises, Inc. v. County of St. Louis, Mo.*, 673 F.3d 799, 805 (8th Cir. 2012). Here, it is undisputed that Deputy Whitney was acting "under color of state law" when he

---

[8] *Id.* at 14.

[9] *Id.*

[10] *Id.*

[11] Complaint (docket number 2) at 19, ¶ 88.

arrested Carolus. Accordingly, the issue is whether Carolus' warrantless arrest deprived him of "a constitutionally protected federal right."

"It is well established that a warrantless arrest without probable cause violates an individual's constitutional rights under the Fourth and Fourteenth Amendments." *Bechman v. Magill*, 745 F.3d 331, 334 (8th Cir. 2014) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)). *See also Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013). For purposes of a § 1983 action, however, it is something of a misnomer to refer to "probable cause," because qualified immunity protects an officer from suit if he acted with "*arguable* probable cause."

> "A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause, and an officer is entitled to qualified immunity if there is at least 'arguable probable cause.'" Probable cause to make a warrantless arrest exists "when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." "Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" The probable cause standard inherently allows room for reasonable mistakes by a reasonable person, but the qualified immunity standard affords law enforcement officials an even wider birth for mistaken judgments "by protecting all but the plainly incompetent or those who knowingly violate the law."

*Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013) (internal citations omitted). *See also Chevallier v. Hand*, 722 F.3d 1101, 1104 (8th Cir. 2013) ("An officer is entitled to qualified immunity for a warrantless arrest if the arrest was supported by at least 'arguable probable cause.'"); *Galarnyk v. Fraser*, 687 F.3d 1070, 1074 (8th Cir. 2012) ("In a claim for damages, officers are 'entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so, provided that the

mistake is objectively reasonable' — that is, officers are not liable if they had 'arguable probable cause' to make the arrest.").

Accordingly, the issue in this case — simply put — is whether, at the time he placed Carolus under arrest, Deputy Whitney had probable cause, or at least *arguable* probable cause, to believe Carolus violated a no contact order. On December 18, 2011, there were two court orders prohibiting Carolus and Pamela from having any contact: the June 15, 2011 temporary restraining order and the October 16, 2011 no contact order.

The temporary restraining order entered by Judge McKinley on June 15, 2011 provided that "the parties are mutually enjoined and restrained from being or coming into each other's presence or communicating, whether directly or indirectly, with each other except as specifically permitted" in certain carefully-drawn exceptions.[12] In fact, the order went so far as to require the parties to exchange the children at the school or at the police station. On October 15, 2011, the parties agreed to exchange the children in violation of the court order, and an altercation occurred.

The no contact order entered by Magistrate Egli on October 16, 2011 provided that Pamela could not communicate with Carolus or be in "the immediate vicinity of the residence or place of employment" of Carolus. While the no contact order specifically directed Pamela not to have any contact with Carolus, under Iowa law it also prohibited Carolus from having any contact with Pamela. *Henley v. Iowa Dist. Court for Emmet County*, 533 N.W.2d 199, 202 (Iowa 1995) (holding that a "protected party" in a Chapter 237 proceeding may be found in contempt for aiding and abetting a violation of the no contact order). This fact was made clear to Carolus by Judge Newell at the hearing on November 21, 2011, when Judge Newell explicitly told Carolus that "you can't have contact with her and she can't have contact with you." In his written order which followed

---

[12] By its terms, the temporary restraining order superseded the order entered by Judge Riffel on October 19, 2010 in the domestic abuse action.

the hearing, Judge Newell again made it clear that "Wayne Carolus is prohibited from having contact with Pamela Carolus."

Carolus argues that probable cause was lacking for his arrest, however, because there was nothing in the no contact order (or the civil temporary restraining order, for that matter) which specifically prohibited him from going to the farm where Pamela was residing. The issue was addressed, however, in the hearing before Judge Newell on November 21. A close reading of the transcript reflects that Judge Newell expressed no position on the specific question of whether Judge McKinley's temporary restraining order or Magistrate Egli's no contact order prohibited Carolus from going to the farm. When Carolus advised Judge Newell that he had been told by Deputy Whitney that the no contact order prohibited him from being on the farm, Judge Newell responded "this order doesn't do that." But when Carolus asked that the assistant county attorney instruct the sheriff's department that he was allowed to be on the farm, Judge Newell responded "I don't know that that's true." In other words, while Judge Newell stated that the no contact order did not prohibit Carolus from being on the farm, Judge Newell also stated that he did not know it was "true" that Carolus was allowed to be on the farm.

It is easy to see, however, why Carolus may have left the hearing believing that he had authority to be on the farm. The assistant county attorney told Judge Newell that she had advised Carolus that the no contact order also prevented him from having contact with Pamela, but she also told Carolus that "if he had to conduct farming activities, I didn't see any reason he couldn't go onto his farm as long as he didn't have contact with Mrs. Carolus or go into the house where she was residing." Pamela's attorney apparently agreed with that assessment. She noted that neither the Chapter 236 order nor the temporary restraining order entered in the divorce "really addressed the farm, per se." Pamela's attorney then opined that "I think as long as they didn't have direct personal contact, he could go into the fields; he just can't go in the house."

It must be emphasized, however, that the issue before the Court is not whether the temporary restraining order or the no contact order prohibited Carolus from going to the farm, and it is not whether Carolus could be found in contempt of court for going to the farm. Instead, the issue is whether, at the time he placed Carolus under arrest, Deputy Whitney had probable cause to believe Carolus was in violation of the no contact order or, if probable cause was lacking, whether Whitney's belief that probable cause existed was "objectively reasonable"; that is, that there was *arguable* probable cause. "Whether a warrantless arrest was supported by probable cause 'is a question of law for a court to decide.'" *Gibson v. Cook*, ___ F.3d ___, 2014 WL 4085821 (8th Cir., dec. Aug. 20, 2014) (quoting *Fisher v. Wal-Mart Stores, Inc.*, 619 F.3d 811, 816 (8th Cir. 2010)).

With these legal principles and background facts in mind, the Court now turns to the events of December 18, 2011. Deputy Whitney was dispatched to the farm where Pamela and the children were residing, based on a 911 call reporting a violation of a no contact order. When he arrived in the area, Whitney found Carolus and his brother leaving. Carolus admitted being on the farm and admitted having contact with Pamela. When Whitney told Carolus that he was prohibited from going to the farm, Carolus said that was not true and informed Whitney that "a judge told him that he could go out there for farming duties." Whitney reviewed "paperwork" provided by Carolus, but it contained no language regarding whether or not Carolus was permitted to go to the farm. Carolus claims that Pam initiated the contact by coming out of the house while he was there. Pam told officers that she did not know Carolus was on the property when she walked out to the building where Darin was loading certain items. In determining whether probable cause existed, "it is well-established that 'officers are not required to conduct a mini-trial before arrest.'" *Id.* (quoting *Fisher*, 619 F.3d at 817). "Officers are generally entitled to rely on the veracity of information supplied by the victim of a crime." *Id.* (quoting *Fisher*, 619 F.3d at 816-17).

Probable cause to make a warrantless arrest exists "when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense." *Ulrich*, 715 F.3d at 1059. Here, Deputy Whitney knew that there was a no contact order in place which prohibited Carolus and Pamela from having contact with one another. Whitney knew that Carolus had gone to the farm where Pamela was living, resulting in contact between the two of them. Without deciding the issue of whether the no contact order (or the temporary restraining order) prohibited Carolus from going to the farm, there were sufficient facts to lead a reasonable person to believe that Carolus had violated the no contact order. Because there was probable cause, Carolus' warrantless arrest did not violate the Fourth or Fourteenth Amendments.

Even if probable cause was lacking, however, the Court believes that there was at least *arguable* probable cause. Deputy Whitney did not rely solely on the no contact order when placing Carolus under arrest. Instead, he and Detective MacDonald attempted to verify Carolus' claim that he was entitled to be at the farm. MacDonald first tried to call the assistant county attorney, and left a voicemail. When MacDonald was unable to speak with the assistant county attorney, he called Judge Newell directly. MacDonald reported to Whitney that Judge Newell said he did not make any changes to the no contact order and "had not given any verbal permission" for Carolus to enter the farm. Carolus argues that the statements of Judge Newell are hearsay. As Defendants correctly note in their reply brief, however, the statements are not hearsay because they are not offered for the truth of the matters asserted. That is, the issue is *not* whether Carolus was in fact prohibited from going to the farm, but rather what Whitney was told in that regard prior to Carolus' arrest. *United States v. Wright*, 739 F.3d 1160, 1170 (8th Cir. 2014) ("A statement offered to show its effect on the listener is not hearsay.").

"Arguable probable cause exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is 'objectively reasonable.'" *Ulrich*,

15

715 F.3d at 1059. Here, Deputy Whitney attempted to verify Carolus' claim that he was authorized to be on the farm. Instead, Whitney was told that no changes were made to the no contact order (which is silent on the issue) and that Judge Newell had not given "verbal permission" at the recent hearing. Again, Whitney knew that Carolus and Pamela were prohibited from having contact with one another, knew that Carolus had gone to the farm where Pamela was residing, and knew that contact had occurred. Even *if* Whitney was mistaken in his belief that probable cause existed to arrest Carolus, the Court believes the mistake was objectively reasonable. Because there was arguable probable cause to arrest Carolus, Whitney is protected from suit by the doctrine of qualified immunity.

### B. State Civil Rights Claim

In Division III of his Complaint, Carolus argues alternatively that he is entitled to damages for a violation of his state constitutional rights. In his Complaint, Carolus claims that his warrantless arrest violated Article I, Section 1 of the Constitution of the State of Iowa and the 45th Amendment to the State Constitution.[13] In his answers to interrogatories, however, he cites Article I, Section 8.[14] *See* Defendants' App. 68.

---

[13] Article I, Section 1 of the Iowa Constitution states:
> All men and women are, by nature, free and equal, and have certain inalienable rights - among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursuing and obtaining safety and happiness.

In 1998, the 45th Amendment inserted "and women" to Article 1, Section 1.

[14] Article I, Section 8 of the Iowa Constitution states:
> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Carolus believes that such a claim is analogous to a federal *Bivens* claim.[15] Carolus acknowledges in his brief that "the Iowa Supreme Court has not yet expressly accepted the *Bivens* doctrine for state claims," but argues that such a claim has been recognized by this Court in *McCabe v. Macaulay*, 551 F. Supp. 2d 771 (N.D. Iowa 2007).

Carolus has not cited any Iowa cases for the proposition that the Iowa Constitution provides any additional protections regarding warrantless arrest; that is, which are not afforded by the United States Constitution. As set forth above, the Court has concluded that there was no constitutional violation. Accordingly, it is unnecessary for the Court to determine whether a violation of the Iowa Constitution gives rise to an independent claim for money damages. That is, even *if* such a cause of action exists, it provides Carolus no relief in this case.

## V. ORDER

IT IS HEREBY ORDERED, for the reasons set forth above, as follows:

1. The Motion for Summary Judgment (docket number 15) filed by the Defendants is **GRANTED**.

2. The Complaint (docket number 2) filed by the Plaintiff is **DISMISSED**.

3. This case is **CLOSED**.

DATED this 5th day of September, 2014.

_____
JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA

---

[15] *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971).